IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAVID GABLE, | Case No. 2:15-CV-02688 |
| Plaintiff, | |
| | JUDGE ALGENON L. MARBLEY |
| v. | |
| | Magistrate Judge Terence P. Kemp |
| HORTON EMERGENCY VEHICLES, | |
| Defendant. | |

**OPINION & ORDER**

This matter is before the Court on the Motion for Summary Judgment of Defendant Horton Emergency Vehicles ("Horton"). For the reasons that follow, the Court **DENIES** Horton's motion.

**I.    BACKGROUND**

This case arises from the alleged disability discrimination of Horton against Plaintiff, a former employee. Plaintiff alleges that Defendant violated Ohio and federal discrimination laws when it fired him eleven days after he began his employment and two days after he informed a Human Resources Director that he had blood cancer.

**A.    Factual History[1]**

Horton is a manufacturer of ambulances in Grove City. Horton hired Plaintiff David Gable ("Mr. Gable" or "Gable") on May 11, 2015, to be a Paint Manager. (Gable Aff't at ¶ 2.) Prior to working for Horton, Mr. Gable had been a manager for twenty-five years, "supervis[ing], train[ing] and develop[ing] employees, supervisors, engineers and other managers." (*Id.* at ¶ 3.)

---

[1] As this is a motion for summary judgment, the Court presents the facts in the light most favorable to the nonmoving party.

1

Mr. Gable was hired to address issues in the paint shop, which had been "let go for quite some time[.]" (*Id.* at ¶¶ 2, 4.) Upon his arrival, Mr. Gable inspected the facility and found numerous OSHA violations, which he worked diligently to address. (*Id.* at ¶ 2.) These violations included "air purifier equipment for employees to breath [sic] fresh air [that] had not been working properly which could cause chronic and acute breathing issues; exposed live wires only a couple feet away from paint booth door, several open solvent containers that were not grounded, unlabeled containers with paint and solvent in them, VOC log was not being filled out for months, and several other violations[.]" (*Id.*) Mr. Gable showed all three shifts of employees the violations, and took pictures of them for future training opportunities. (*Id*. at ¶¶ 2-3.) He asked for, and received, additional employees to help him address these violations over his first weekend on the job. (*Id.* at ¶ 2.) Horton denies having any OSHA violations. (Doc. 25-1.)

Mr. Gable wanted to observe every shift at Horton, to inspect properly the ambulances, and to keep up production by making sure that he had three to four ambulances in the queue. (Gable Aff't at ¶ 7.) Therefore, on most days, he worked from 5:30 a.m. until 3:30 or 4:30 p.m. (*Id.*) Although Mr. Gable had only been working at Horton for a few days, at the request of Horton, he completed appraisals of several employees. (*Id.* at ¶ 3.) Because he had not met many of the employees that Horton had asked him to appraise, he enlisted the help of Jeffrey Gillespie, a newly-appointed supervisor. (*Id.*) He discussed the appraisals with any employees who disagreed with his assessment, and everyone left satisfied. (*Id.*)

Mr. Gable alleges that his superiors were happy with his work. Donald Meister, Vice President of Operations, told Mr. Gable twice that he was doing a good job. (*Id.* at ¶ 8.) For example, in response to his showing employees the OSHA violations, Mr. Meister said: "Good job. This is what needs to be done. These people need direction." (*Id.* at ¶ 3.) Human

2

Resources Director Rebecca Baciak told him he was doing a good job "at least three times." (*Id.* at ¶ 8.) President John Slauson also told him he was doing a good job. (*Id.*) Mr. Slauson, for example, was "happy that [Mr. Gable] had been hired" because "they were impressed with what [he] had accomplished so far" and "they were lucky to have found [him,]" because "the Company had searched for a long time for someone with production, technical paint, and leadership experience to come to Horton and turn things around." (*Id.* at ¶ 4.) Mr. Slauson then invited Mr. Gable and his wife to a round of golf. (*Id.*)

Everything changed on May 20, 2015 when Mr. Gable told Ms. Baciak that he had cancer. (*Id.* at ¶ 10.) Mr. Gable had gone into Ms. Baciak's office at her request to discuss supervisor Jeffrey Gillespie's work performance. (*Id.*) Ms. Baciak had apologized for being late to the meeting, and explained that she had just been to the doctor because she was being treated for cancer. (*Id.*) Mr. Gable empathized, divulging that he, too, had polycythemia vera—a form of blood cancer that could, but usually did not, develop into leukemia. (*Id.*) He mentioned that he was taking chemotherapy pills, and that he also took blood thinners to treat a blood clot that ran from his ankle to his mid-thigh. (*Id.*) He "disclosed his history because [he] wanted the Company to know in case [he] ever had another blood clot or started to bleed from an injury." (*Id.*) Ms. Baciak sympathized, mentioning that her uncle had a similar issue. (*Id.*)

After that meeting, Mr. Gable drove to Pennsylvania to finish making arrangements to move to Columbus, Ohio. (*Id.* at ¶ 11.) The next day, on May 21, 2015, Ms. Baciak called "to inform [him] that [he] was being terminated effective the next day, Friday, May 22." (*Id.*) The reason given: they "were going in a different direction." (*Id.*) Mr. Gable would not be paid after May 22, eleven days after he was hired. (*Id.*) Mr. Gable threatened to sue. (*Id.*)

3

Horton now tells Mr. Gable that he was fired, in part, because of allegations that he told employees that it would be "[his] way or the highway." (*Id.* at ¶ 3.) Mr. Gable denies making any such statement. (*Id.*) Mr. Meister, on the other hand, had heard complaints about the "my way or the highway" comment, though he does not divulge the source of these complaints. (Meister Decl., Doc. 25, at ¶ 5.) His reaction? He "determined that it would be best for the company to immediately terminate David's employment before he could do any more damage." (*Id.*) He consulted his immediate supervisor, Horton President Jon Slauson, and recommended that Mr. Gable be terminated immediately. (*Id.*) Mr. Slauson approved. (*Id.*) Mr. Meister then called Ms. Baciak to "inform[ ] [her] of the decision." (*Id.*)

Horton has a progressive discipline policy that, "[u]nder normal circumstances," "attempts to provide associates with notice of deficiencies and an opportunity to improve." (Employee Handbook, Doc. 33-2, at 3.) The progressive discipline policy provides for Horton to give an offending associate a verbal warning, followed by a written warning, a final warning, and then, finally, discharge. (*Id.* at 3-4.) Horton may bypass its progressive discipline policy only under certain circumstances:

> In cases involving serious misconduct, or anytime management determines it is necessary, such as a major breach of policy or violation of law, the steps described above may be disregarded. With some serious violations, the associate may be suspended immediately until such time that an investigation can be conducted to determine what further action, if any, should be taken.

(*Id.* at 4.) Neither Mr. Meister nor Ms. Baciak conducted any investigation of Mr. Gable before it fired him. (Baciak Decl. and attachments, Docs. 24 and 24-1; Meister Decl., Doc. 25.) Nor did they provide him with verbal or written warnings, a final warning, a suspension pending investigation, or a chance to refute the allegations. (*Id.*; Gable Aff't at ¶ 3.) After Ms. Baciak called to terminate Mr. Gable, she took the statements of three employees who allegedly heard and felt intimidated by the "my way or the highway" comment. (Baciak Decl. and attachments,

4

Docs. 24 and 24-1.)  For his part, after Mr. Gable threatened to sue, Mr. Meister prepared a statement of reasons for the termination.  (Meister Decl. and attachments, Docs. 25 and 25-1.)

Other employees at Horton had issues and they were not fired.  Mr. Meister "was unprofessional in his conduct at manager meetings.  He made fun of employees."  (Gable Aff't at ¶ 5.)  EHS manager Jason Painter told Ms. Baciak that Horton employees liked her "because [she had] big tits.  They like anybody with tits."  (*Id.*)  Mr. Meister overheard this comment, and did nothing.  (*Id.*)  Mr. Painter also made a racist remark in front of two African-American employees and Mr. Gable.  (*Id.* at ¶ 6.)  Mr. Gable spoke about the incident with Ms. Baciak, who did nothing.  (*Id.*)  Another employee, Roby Salyer, took several days off work because he was angry he did not receive a promotion that he had been promised.  (*Id.* at ¶ 12.)  Mr. Gable spoke with Mr. Salyer, explained that these actions were inappropriate, and promised to "help develop him."  (*Id.*)  Mr. Gable also convinced Third Shift Paint Superintenent Roger McKeown to stay after he threatened to quit because "the Company was very unprofessional and he did not like the way the things were handled."  (*Id.* at ¶ 14.)

### B. Procedural History

Plaintiff brought a one-count complaint against Defendant on August 4, 2015, for disability discrimination under the Ohio Civil Rights Act.  (Doc. 1.)  On March 29, 2016, Plaintiff amended his complaint to add a claim for disability discrimination under the Americans with Disabilities Act ("ADA").  (Doc. 12.)  Defendant moved for summary judgment on June 15, 2016.  (Doc. 22.)  The motion is fully briefed and is ripe for review.

### II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).  Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party who has the burden of proof at trial must "make a showing sufficient to establish the existence of [each] element that is essential to that party's case." *Muncie Power Products, Inc. v. United Technologies Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003).  The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52).  In evaluating such a motion, the Court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the non-moving party's favor.  *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party.  *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. ANALYSIS

Although he does not pinpoint specific provisions, Mr. Gable brings claims for disability discrimination under the Ohio Civil Rights Act, O.R.C. § 4112.02, and the ADA. 42 U.S.C. § 12112(a). Section 4112.02 of the Ohio Civil Rights Act makes it an "unlawful discriminatory practice" for an employer, "because of the…disability…of any person, to discharge without just cause…or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment[.]" O.R.C. § 4112.02. Section 4112.99 of the Ohio Revised Code provides Plaintiff with a "civil action for damages, injunctive relief, or any other appropriate relief." O.R.C. § 4112.99.

Title I of the ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to … discharge of employees." 42 U.S.C. § 12112(a); *Nilles v. Givaudan Flavors Corp.*, 521 Fed. Appx. 364, 367 (6th Cir. 2013). Because "analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02[,]" the Court will evaluate the Ohio claims "concurrently and under the same standards as claims brought under the ADA." *Nilles*, 521 Fed. Appx. at 367-68.

A disabled plaintiff may prove disability discrimination under the ADA in two ways: direct evidence of discrimination, or circumstantial evidence that creates an inference of discrimination. *Gohl v. Livonia Public Schools School District*, 836 F.3d 672, 682 (6th Cir. 2016). Because Plaintiff has not introduced direct evidence of discrimination, the Court applies the burden-shifting framework for circumstantial evidence established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In the ADA context, Plaintiff must first make a prima facie case of discrimination by showing that:

7

>1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011).[2]  If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Nilles*, 521 Fed. Appx. at 367.  If the defendant does so, the plaintiff must then prove that the defendant's proffered reason was pretextual.  *Id.*

Despite Gable's argument on pretext, Horton explicitly limits its motion for summary judgment to whether Gable can establish his *prima facie* case: "if the Court would determine that Gable has presented a *prima facie* case, summary judgment necessarily should be denied since Horton has not advanced any other basis for summary judgment at this time."  (Doc. 34 at 16.)  The Court will therefore so limit its analysis.  On the merits of Gable's *prima facie* case, Horton does not dispute that Mr. Gable was qualified for his position, that he suffered an adverse employment decision, or that Mr. Gable was replaced.  (*See* Docs. 22, 34.)  Instead, Horton argues that Mr. Gable does not have any disability, and, even assuming a disability, Horton fired him without knowing about it.

---

[2] The Sixth Circuit has also used a three-part test for a plaintiff's *prima facie* case, requiring a plaintiff to show: "(1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) a causal link ties the disability to the adverse employment action."  *Blazek v. City of Lakewood, Ohio*, 576 Fed. Appx. 512, 516 (6th Cir. 2014) (quotation omitted).  The Court finds no tension between the two tests, as factors three through five of the *Whitfield* test simply appears to break down the "causal link" factor of the shorter test.  In particular, to assess a causal link, the Court analyzes whether the employer knew about the plaintiff's disability, whether that knowledge caused the employer to make an adverse employment decision, and whether the plaintiff was replaced following such an adverse decision.

## A. Disability

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).[3] Neither party develops any argument regarding whether Plaintiff is disabled under the ADA. Plaintiff posits that Horton regarded him as disabled, but does not elaborate: "the plaintiff can show that he/she was regarded as disabled." (Doc. 33 at 8.) Defendant posits that Plaintiff is *not* disabled, but Defendant *also* does not elaborate: "Furthermore, Nilles actually had a disability….Obviously, the decision makers could not have regarded Gable as disabled if they had no knowledge of his condition!" (Doc. 22 at 6.)

The Sixth Circuit has held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir.1997) (citation omitted). Much flesh is missing from the skeleton of whether Mr. Gable is "disabled" under the ADA. Plaintiff could be "regarded as" disabled under the ADA if he was terminated "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3). A perceived disability qualifies as a disability under the ADA "if the employer actually perceives the disability to substantially limit a major life activity of the employee." *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 310–11 (6th Cir. 2000). Major life activities include "functions

---

[3] Ohio law is similar: "[u]nder both federal regulations and Ohio code, a 'disability' is an impairment, physical or mental, which substantially limits one or more of an individual's major life activities, a record of *such* impairment, or being regarded as one having *such* an impairment." *Rhoads v. Board of Educ. of Mad River Local School Dist.*, 103 Fed. Appx. 888, 898 n.2 (6th Cir. 2004) (citing *Ferguson v. Lear Corp.*, 155 Ohio App.3d 677, 802 N.E.2d 1141, 1148 (2003)).

9

such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.*, quoting 29 C.F.R. § 1630.2(i). Substantially limits means an "inability to perform or a significant restriction on the ability to perform as compared to the average person in the general population." *Id.*, quoting 29 C.F.R. § 1630.2(j).

Neither party points to any facts or develops any arguments relating to the above statutory framework. The Court will not grant summary judgment for Defendant on the issue of disability, where Defendant "does not cite any authority in connection with its argument…and does not attempt to develop any real analysis." *Provident Life & Acc. Ins. Co. v. McCoy*, No. C-2-98-699, 2006 WL 5909027, at *17 n.1 (S.D. Ohio Feb. 1, 2006).

### B. Employer's Knowledge of the Disability

Horton devotes its energy to arguing that it did not know about Mr. Gable's condition when it discharged him. (Doc. 22 at 5-7; Doc. 34 at 7-16.) Horton cites *Nilles v. Givaudan Flavors Corp.* as "clear legal precedent addressing a factually indistinct case." 521 Fed. Appx. 364 (6th Cir. 2013). While the plaintiff in *Nilles* was a supervisor who shared the fact of his disability with a member of the employer's human resources department and then sued for disability discrimination after he was fired, the resemblance ends there.

In *Nilles*, Givaudan hired Nilles into a supervisory position in 2003 and fired him in late 2009 following several incidents in 2008 and 2009. *Id.* at 365-66. In 2008, a subordinate to Nilles left the company, citing a "'very difficult manager/subordinate relationship with Joe Nilles'" as the primary reason for her resignation. *Id.* at 365. Following this revelation, an employee in human resources consulted with Nilles' supervisor, Dabney, and "suggest[ed] that he develop 'a plan of action with regard to [Nilles] before other people exit the company, or the perception of [his] department suffers more.'" *Id.* Following this exchange, Dabney spoke with Nilles several times about the issues, including in his 2008 annual evaluation. *Id.* Nilles did not

deny having had the conversations, but rather argued that "these conversations did not constitute formal discipline." *Id.* He also argued that his receipt of a bonus in 2008 undercut the idea that his job was in jeopardy. *Id.* Dabney and the human resources employee planned to terminate Nilles after they could train his replacement. *Id.* at 365-66.

Meanwhile, the human resources employee was replaced by Spencer. *Id.* at 366. Spencer was aware of, but did not participate in, the plan to terminate Nilles. *Id.* Spencer did, however, recommend that Nilles' supervisor compare Nilles with his replacement to ensure that the replacement could fill Nilles' position. *Id*. In July 2009, another of Nilles' subordinates resigned, citing issues with Nilles as the reason he started seeking employment elsewhere. *Id.* Dabney received approval for Nilles' termination from his own supervisor in Switzerland, and, in October 2009, Dabney and Spencer notified Nilles that he was terminated. *Id.*

After he was fired, Nilles sued Givaudan for disability discrimination, among other things, because, in April 2009, Nilles had confided in Spencer that he had multiple sclerosis ("MS"). *Id.* at 366-67. Nilles asked Spencer to keep the diagnosis in confidence, and Spencer did not share Nilles' diagnosis with anyone at Givaudan. *Id.* at 366. Nilles had taken time off of work under the Family and Medical Leave Act, but he did not cite MS as the cause. *Id.* Rather, he cited a respiratory infection, dizziness, and headaches. *Id.*

The Sixth Circuit held, on this record, that "Nilles ha[d] clearly failed to carry his burden of showing that Dabney, [who Nilles had conceded was] the sole decision-maker with respect to Nilles's firing, knew of his disability." *Id.* at 368. The fact that Nilles had taken FMLA leave for a respiratory infection, dizziness, and a headache was not sufficient evidence that Dabney knew Nilles had MS. The fact that Dabney had discussed with Spencer the "*process* for firing Nilles" was not sufficient evidence that Dabney knew Nilles had MS. *Id.* at 369.

11

*Nilles* is distinguishable from this case. Where in *Nilles*, the plaintiff asked Spencer to maintain his diagnosis in confidence, Gable told Ms. Biacek about his issues "because [he] wanted the Company to know in case [he] ever had another blood clot or started to bleed from an injury." (Gable Aff't. at ¶ 10.) In *Nilles*, the plaintiff did not dispute that Dabney was the sole decision maker in his termination. *Nilles*, 521 Fed. Appx. at 368. Here, Mr. Gable argues that Ms. Baciak had input into Mr. Gable's termination, because: (a) she "confirms that she was involved in terminations in the past" (Doc. 33 at 10); (b) she had discussed non-attendance-related issues about Jeffrey Gillespie with Mr. Gable (*id.*); (c) Mr. Meister called her to discuss terminating Mr. Gable (*id.*); (d) she conveniently recalls facts related to Horton's defense but not related to Mr. Gable's claim, such as whether she recommended terminating Mr. Gable during the phone call with Mr. Meister (*id.* at 10-12); (e) she was familiar with Horton's progressive discipline policy but did not advise Mr. Meister to follow the company's progressive discipline policy (*id.*at 12);[4] and (f) she was familiar with the seriousness of Mr. Gable's condition since her family member had the same condition. (*Id.*) Moreover, after a long, documented history of employment issues, Nilles was fired six months after telling Spencer about his MS. Mr. Gable, with a clean record until after he was fired, was terminated the next day.

Horton takes the position that it fired Mr. Gable following a meeting Mr. Gable held with his subordinates on May 15, 2015, where he allegedly said "it was his way or the highway, and threatened that anyone who did not do things his way would be fired." (Doc. 25 at ¶ 4.) Sometime in the six-day span between Mr. Gable's May 15, 2015 meetings and his May 21, 2015 termination, Mr. Meister "received reports from these supervisors that employees in the

---

[4] The Court notes that Horton does not address whether the progressive discipline policy, promulgated for "associates," applies to Mr. Gable, who held the position of "manager." In the absence of contrary evidence, the Court will view the facts in the light most favorable to Plaintiff and assume that the progressive discipline policy applies to Mr. Gable.

12

paint shop were threatening to quit over the way David was treating them." (*Id*.) Mr. Meister apparently perceived the alleged "my way or the highway" threat to be serious enough to "immediately terminate" Mr. Gable without investigation and without giving him any chance to explain or reform. (Doc. 25 at ¶ 5.)

The Court finds that disputes of material fact preclude summary judgment in this case, because Horton did not follow its own disciplinary procedures; and a reasonable jury could infer that Ms. Baciak, who knew of Mr. Gable's disability, influenced Mr. Gable's termination. First, in firing Mr. Gable, Horton did not follow the disciplinary procedures prescribed by its employee handbook. Horton's employee handbook contains a progressive discipline policy that provides for a verbal warning, followed by a written warning, a final warning, and, finally, discharge. (Employee Handbook, Doc. 33-2, at 3-4.)[5] The policy allows Horton to skip its "normal disciplinary procedure" in certain, very limited, circumstances:

> In cases involving **serious misconduct**, or anytime management determines it is necessary, such as a **major breach of policy or violation of law**, the steps described above may be disregarded. **With some serious violations, the associate may be suspended** immediately until such time that an investigation can be conducted to determine what further action, if any, should be taken.

(*Id.* at 4) (emphasis added). In immediately terminating Mr. Gable, Mr. Meister declined to give Mr. Gable a verbal warning, a written warning, a final warning, or to suspend him pending an investigation into his conduct. Horton did not even investigate Mr. Gable's conduct. Instead,

---

[5] Citing no case law and no particular justification, Horton argues that Mr. Gable's exhibits, including its own employee handbook, should be disregarded. (Doc. 34 at 15.) The Court declines to disregard Mr. Gable's exhibits. *See*, *e.g.*, Fed. R. Civ. P. 56(c)(1)(A) (replacing the bright-line rule of former FRCP 56(e) with a more flexible framework designed to bring pretrial procedure closer in line with objections at trial); *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) (citing Advisory Committee comments to the 2010 amendments). Horton has not objected that the material cited cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).

Horton waited until *after* Mr. Gable's termination to gather statements from a few employees and create a statement of reasons. (Doc. 33 at 12.)

Second, on this evidence, a reasonable jury could find that Ms. Baciak, who knew of Mr. Gable's disability, influenced his termination. Mr. Meister asserts that *he* made the decision to fire Mr. Gable following "complaints about his poor treatment of employees in the paint shop[.]" (Doc. 25 at ¶ 4) Mr. Meister does not reveal the source of these complaints, however. Nor does Roby Salyer, a paint shop supervisor who Mr. Gable allegedly intimidated with his remarks on May 15th. (Doc. 26 at ¶ 3.) Although Mr. Salyer "observed paint shop employees being on edge because they were concerned about their jobs and the way Mr. Gable was treating people[,]" (*id.*), he does not mention complaining to Mr. Meister. (*See generally*, Doc. 26.) Nor does anyone else. In short, despite a vague reference to reports from "supervisors," the evidence does not reveal who complained to Mr. Meister, or that complaints were registered with Mr. Meister at all.

Read in the light most favorable to Plaintiff, a reasonable jury could find Ms. Baciak to be a complaining source. According to Mr. Gable, Ms. Baciak learned about his condition on May 20th. Ms. Baciak was indisputably in contact with Mr. Meister about Mr. Gable's termination, and Ms. Baciak handled at least some disciplinary matters. A communication from Ms. Baciak to Mr. Meister on May 20th with the shocking news of Mr. Gable's condition would be consistent with the fact that Mr. Gable was terminated on May 21st without any investigation, reparatory discussions, or progressive discipline. Even if Ms. Baciak did not discuss Mr. Gable's *disability* with Mr. Meister, she could implicate Horton in disability discrimination by feeding Mr. Meister negative information about Mr. Gable's work performance. (*See* Doc. 33 at 9.) *See also Bonner v. Scope Services, Inc.*, Case No. 1:12–cv–32, 2015 WL 4465038, *7 (S.D. Ohio

July 21, 2015) ("an employer may be liable under the cat's paw theory for an intermediate employee's discriminatory motive when the employer takes into account facts provided by the biased supervisor in determining whether to take a particular adverse action when that biased supervisor's action was intended to cause the adverse employment action.") (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). *But see Henderson v. Chrysler Group, LLC*, 610 Fed. Appx. 488, 497 (6th Cir. 2015) ("we have not yet extended the cat's paw theory of liability to claims under the ADA.").

A reasonable jury could also have found Ms. Baciak to have had more involvement in Mr. Gable's termination than she remembers in her deposition. Ms. Baciak was, after all, the human resources director: (a) to whom Mr. Gable turned with his cancer diagnosis; (b) who consulted with Mr. Meister, the purported decisionmaker, regarding Mr. Gable's termination; and (c) who delivered the bad news to Mr. Gable. Defendant's evidence to the contrary, which consists of self-serving affidavits and a deposition in which Ms. Baciak fails to recall key details, "present[s] on [its] face sufficiently serious questions of credibility and reliability as to preclude summary judgment." *Johnston v. United States*, 568 F.Supp. 351, 355 (D. Kan. 1983).

Moreover, a reasonable jury could find that the one-day time lag between disclosure and termination supports Mr. Gable's claim that Mr. Meister knew of his disability. *Welch v. IAC Huron, LLC*, for example, is instructive. 12–cv–02334, 2013 WL 4817591 (N.D. Ohio Sept. 10, 2013). Welch was suffering from a shoulder injury, and was fired shortly after "she did not call to inform IAC that she would be absent on September 13, 14, or 15." *Id.* at *1. In *Welch*, as in Gable's case, the employer argued that it did not have knowledge of her disability, and submitted an affidavit to that effect. *Id.* at 4. Unlike Gable, Welch did not tell *anyone* at work about her injury, although she argued that her coworkers could see that she was in pain. *See id.* The

15

allegation that coworkers could see she was in pain, paired with the employer's knowledge that she was on short-term disability leave, and the temporal proximity between this leave and her termination, was "sufficient to create a genuine issue as to whether [Defendant] knew [Welch] had a disability.").[6] *Id.* Gable's case is stronger. Here, Ms. Baciak had actual knowledge of Mr. Gable's disability and she was actively involved in his termination, which occurred one day after he told her he had cancer. Viewed in the light most favorable to Mr. Gable, the evidence is sufficient to raise a genuine issue of material fact.

## IV. CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

                                                       s/ Algenon L. Marbley

                                                       **ALGENON L. MARBLEY**

                                                       **UNITED STATES DISTRICT JUDGE**

**DATED: January 9, 2016**

---

[6] As discussed *supra*, footnote 2, the Sixth Circuit has two, parallel formulations of the *prima facie* case for disability discrimination. The "causal link" formulation also presents itself in the FMLA retaliation context and the pregnancy discrimination context. In finding such a causal nexus, the Sixth Circuit has embraced the principle that "timing matters." *Clark v. Walgreen Co.*, 424 Fed.Appx. 467, 473 (6th Cir. 2011) ("the court correctly credited the temporal proximity of Clark's leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."); *A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013) ("Temporal proximity can often help meet this causal burden, and where the adverse action comes 'very close in time' after the exercise of protected activity, 'such temporal proximity ... is significant enough' to meet the burden alone[.]") (internal citation omitted); *Alexander v. Trilogy Health Services, LLC*, No. 11-cv-295, 2012 WL 5268701, at *7 (S.D. Ohio Oct. 23, 2012) ("Temporal proximity between an employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee, is sufficient to support an inference of pregnancy discrimination.")